SUPERIOR MOTORS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Superior Motors, Inc. v. Commissioner
Docket No. 8442-72.
United States Tax Court
T.C. Memo 1974-187; 1974 Tax Ct. Memo LEXIS 131; 33 T.C.M. (CCH) 805; T.C.M. (RIA) 74187; July 22, 1974, Filed. John C. Tune, for the petitioner. Wesley J. Lynes, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioner's income taxes for taxable years 1969 and 1970 in the respective amounts of $19,008.84 and $29,161.39. Concessions have been made, and the only issue remaining for our decision is whether the compensation paid by petitioner to its president, chief executive officer and sole stockholder, David P. Caldwell, is deductible as a reasonable business expense to the extent it exceeds $78,093.63 and $89,729.32 for the taxable years 1969 and 1970, respectively. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Superior Motors, *132 Inc. (petitioner or Superior), is a corporation formed under the laws of Tennessee, having its principal place of business at Nashville, Tennessee, at the time the petition was filed. Superior filed its corporate income tax returns on a calendar year accrual basis during the years in issue with the district director of internal revenue, Chamblee, Georgia. Superior was organized in 1963 by David P. Caldwell (Caldwell) and Glen L. Roberts, each of whom owned 50 percent of Superior's stock. Superior, a franchised Volkswagen dealership, is in the business of selling, servicing and financing new and used Volkswagens. In 1966 Superior redeemed Glen Roberts' stock and Caldwell became Superior's sole stockholder. During the years 1967 through 1970, Caldwell continued to own 100 percent of Superior's stock. From 1963 through 1970, Superior reported its gross sales receipts, gross income and taxable income as follows: Year
Gross Sales Receipts
Gross Income
Taxable Income 1963
$142,133.57
$28,596.47
[11,471.48)
1964
2,506,173.78
464,272.44
70,025.88
1965
3,798,600.54
760,7 42.66
160,451.44
1966
4,606,642.78
977,071.66
138,673.88
1967
5,132,957.29
1,081,614.20
217,583.72
1968
6,165,42 8.44
1,291,332.09
292,045.25
1969
6,437,269.20
1,179,390.99
66,841.14
1970
7,143,837.00
1,363,278.00
148,292.00
*133 Although Superior's gross sales receipts steadily increased in 1969 and 1970, fewer new cars were sold in those years than in 1968 due to increased competition from both U.S. and foreign manufactured small cars.From 1967 through 1970, Superior's volume of new-car sales was as follows: Year:
1967
1968
1969
1970 No. New Cars Sold:
1,090
1,334
1,122
1,285
Superior employed between 70 and 85 persons during the years in issue. Its business operations were organized into six departments, each headed by a manager who was responsible for his department's operations. Each manager personally supervised the employees in his department, including the hiring, firing, training and motivation of the employees. These managers reported directly to Caldwell who served as Superior's president, general manager and chief executive officer. Although Caldwell was personally involved in each department, the managers had complete charge of the daily operations of their respective departments. However, policy decisions were made by Caldwell who was also responsible for Superior's advertising. Thomas R. Campbell (Campbell) was vice president of Superior for the *134 first three months of 1969 and received in compensation an annual salary of $47,650. Petitioner had no vice president after Campbell's departure in early 1969 for the remainder of the years in issue. Charles W. King (King) was secretary-treasurer of Superior throughout 1969 and 1970. King's annual compensation from Superior in 1969 was $15,139.70, and in 1970 was $20,112. Superior had no other officers besides Caldwell, Campbell and King during 1969 and 1970. Caldwell determined and set all corporate policy, including all matters regarding compensation and dividends. In 1968 Superior completed an expansion program which doubled its facilities. This program was largely financed by Superior's own capital and cost approximately $200,000. However, in 1969 and 1970, no new duties were assumed by Caldwell. Superior's retained earnings as reported for the years ended December 31, 1963 through December 31, 1970, are as follows: Year
Retained Earnings
Increase (Decrease) Over Prior $0
1963
[11,471.48)
$ -o-
1964
43,945.37
55,416.85
1965
134,144.34
90,198.97
1966*
110.305.47*
( 23,838.87)*
1967
230,784.34
120,478.87
1968
377,265.53
146,481.19
1969
417,377.83
40,112.30
1970
505,140.00
87,762.17
*135 Caldwell is a highly successful businessman who has built Superior's business into one of the most successful Volkswagen dealerships in the southeastern part of the United States. He has much experience in car sales, and has participated in the ownership and operation of a used or new-car business since the age of 17. Caldwell is a diligent and industrious worker who labored an average of 65 hours per week in 1969 and 1970. He is a demanding employer, determined to meet the high goals he sets for himself and his enterprise. During the years in issue, Caldwell received no paid vacation, and no fringe benefits. In 1969 and 1970, Caldwell had no substantial outside business activities. However, he was a director of an Arkansas corporation from which he received no compensation and was president of Superior Aviation, Inc., a Tennessee corporation, with the same address as petitioner. Although purportedly in the aircraft sales business, Superior Aviation, Inc., owned just a single asset, *136 i.e. an airplane used on occasion in petitioner's business. Caldwell also owned a 75 percent interest in another area, Volkswagen franchised dealership, Reliable Volkswagen; however, he received no compensation from this dealership and his relationship with Reliable Volkswagen was solely that of an investor. From 1963 through 1970, Caldwell received the following amounts as compensation from Superior: Year
Compensation 1963
$ 1,500.00
1964
28,750.00
1965
41,000.00
1966
50,000.00
1967
68,000.00
1968
98,000.00
1969
110,000.00
1970
141,775.00
The total compensation that Superior paid to its officers was $139,094.14 in 1969, and $161,887 in 1970. Caldwell set the amount of his own compensation. The method used to calculate Caldwell's compensation is widely used in the automobile retail sales business. A dollar figure per new car is multiplied times an estimated volume of new-car sales expected by the dealer in the forthcoming fiscal year. The larger the volume of new-car sales, the lower the dollar figure per new-car sale. The estimated volume is based on the number of new cars sold during the first 10 months of the current fiscal year. The *137 estimate multiplied times the dollar figure per new-car sale determines the dealer's salary. In addition to the expected volume of new-car sales in the forthcoming fiscal year, the factors generally used to determine the dollar figure per new-car sale, and the factors used to determine the figure utilized in calculating Caldwell's salary were as follows: 1) experience of the dealer; 2) the dealer's standard of living; 3) the franchise's financial history; and 4) the franchise's location. Above his salary, the dealer also receives a bonus calculated as a percentage of new profits after salary and before taxes. In December 1968, Caldwell set his 1969 salary at $60,000 on the basis of an estimated volume of 1,200 new-car sales, figured at $50 per new-car sale. In December 1969, Caldwell was given a $50,000 bonus as compensation for services rendered in 1969. The bonus was calculated on the basis that he should receive no less a bonus than he received in 1968, which was $50,000. There is no evidence in the record as to how the 1968 bonus had been calculated. In December 1969, Caldwell set his salary at $60,000, on the basis of an estimated 1,200 new-car sales at $50 *138 per new-car sale. Caldwell's 1970 bonus was determined in December 1970, to be one-third of net profits before taxes, or $81,775, arrived at because Caldwell thought it to be a fair figure. For the years 1967 through 1970, Caldwell's compensation from Superior, expressed as a percentage of Superior's gross sales receipts, gross income and taxable income (to the nearest $1,000) is as follows: Year
Compensation
% Gross Sales Receipts
% Gross Income
% Taxable Income 1967
$68,000
1.3
6.3
31
1968
98,000
1.6
7.6
34
1969
110,000
1.7
9.3
164
1970
142,000
2.0
10.4
95
Superior did not pay any dividends in any of the years 1963 through 1970. The three largest U.S. automobile manufacturers each have "dealer development" programs under which a subsidiary of the automobile manufacturer owns the stock of the franchise and the dealer of the franchise is compensated by salary and bonus. Typically, the bonus is given to the dealer to encourage him to purchase the stock of the franchise from the automobile manufacturer and is measured as a percentage of net profits. The following tabulations show the amounts Superior would have paid Caldwell *139 in 1969 and 1970, had Caldwell's compensation been calculated in accordance with either the high, average or low plans of compensation utilized by Chrysler, General Motors or Ford (to nearest $1,000): Chrysler: This plan uses an annual salary range of $30,000 to $36,000, plus a bonus of 25 percent of net profits after salary and before taxes: Year
High
Average
Low 1969
$72,000
$70,000
$68,000
1970
101,000
99,000
97,000
General Motors: This plan uses an annual salary range of $11,400 to $30,000, plus a bonus of 25 percent of net profits after salary and before taxes: Year
High
Average
Low 1969
$68,000
$61,000
$54,000
1970
97,000
90,000
83,000
Ford: This plan uses an extreme annual salary range of $12,000 to $60,000, and a normal range of $18,000 to $36,000, plus a bonus of 25 percent of net profits after salary and before taxes: Extreme Range -
Year High Average Low
1969
$90,000
$72,000
$54,000
1970
119,000
101,000 *0283,00002*
Normal Range -
Year High Average Low
1969
$72,000
$65,000
$59,000
1970
101,000
95,000
88,000
In its corporate income tax *140 returns for 1969 and 1970, pe In its corporate income tax returns for 1969 and 1970, petitioner claimed deductions, respectively, of $110,000 and $141,775 for compensation paid to its president and chief executive officer, David P. Caldwell. Respondent has disallowed these deductions to the extent they exceed $78,093.63 and $89,729.32 for taxable years 1969 and 1970, respectively. We find as ultimate facts that reasonable compensation to Caldwell was $89,000 for 1969, and $117,000 for 1970. OPINION The sole question remaining before us is whether under section 162(a) [1] the amounts so paid by petitioner constitute "a reasonable allowance for salaries or other compensation for personal services actually rendered" to the extent such compensation payments exceeded $78,093.63 in 1969, and $89,729.32 in 1970. This question is one of fact to be decided on the basis of the particular circumstances in each case, and the burden of proving reasonableness rests on the petitioner. ; East Tennessee (C.A. 6, 1971); ; *141 , on appeal (C.A. 10, May 16, 1974). We must closely scrutinize the reasonableness of the salary in the instant case because as president, chief executive officer, sole stockholder and the prime mover of petitioner, Caldwell set his own salary. , affd. (C.A. 10, 1967). The factors to be looked for in determining the reasonableness of compensation have long been established. See (C.A. 6, 1949), affirming a Memorandum Opinion of this Court. We are of the opinion that petitioner has sustained its burden of proof regarding the correctness of respondent's determination of deficiency. However, petitioner has not proved that the amounts paid in compensation to Caldwell were reasonable. On the basis of all the facts and circumstances present in the record before us, this Court has concluded that a reasonable compensation to Caldwell for 1969 is $89,000, and for 1970 *142 is $117,000. Caldwell is quite experienced in the new and used-car sales business, having begun his career with his own used car lot at the age of 17. In 1963 Superior was organized to sell, service and finance new and used Volkswagens in Nashville, Tennessee. Largely through Caldwell's efforts, by 1970 Superior had grown to be one of the most successful franchised Volkswagen dealerships in the southeastern part of the United States. Caldwell's industry, diligence and long hours guided Superior to prosperity. He was a demanding employer with high goals. During the years in issue, Caldwell received no paid vacations or other fringe benefits and had no substantial outside business activities. Superior employed between 70 and 85 employees during 1969 and 1970 who were supervised by six managers. These managers, subject to Caldwell's direction and overseership, had complete charge over the daily operations of their respective staffs. The general practice in the car sales business is to compensate the dealer-owner by both salary and bonus. Witnesses for the petitioner established to the Court's satisfaction that a dollar figure per new-car sale multiplied by the estimated *143 volume of new-car sales in the forthcoming fiscal year is an acceptable method of calculating Caldwell's salary. This Court is also satisfied that a bonus of a percentage of net profits after salary and before taxes is an acceptable method of compensating Caldwell for his services to petitioner. This Court recognizes that bonuses are appropriate to reward extra productive effort during the past year, to encourage efficient work product in the forthcoming year and to provide a means for some dealers to participate as a stockholder in manufacturer-owned franchises. The latter factor is inapposite to the bonuses in the instant case since Caldwell is the sole stockholder; nevertheless, the practice of giving bonuses at year's end is such a widely practiced method of compensating the dealer that this Court will inquire into only the reasonableness of the amount paid and whether it is in fact a payment for services actually rendered or is in reality a return on capital invested. (But see, . With regard to salary it is clear that the more cars a dealership sells, the lower the dollar figure per new-car sale utilized *144 in calculating the dealer's salary. A difference of only 200 new cars sold in the estimated volume of sales for the forthcoming year will have a significant impact on that dollar figure per new-car sale. Yet, most of the experts at trial blurred the relationship between that figure and the estimated volume of new-car sales. Also, some who testified that Caldwell's compensation was reasonable were not familiar with Superior's business; others indicated that they, too, would be taking as much profit as possible out of their respective businesses in the form of salary, except that they did not yet own a controlling interest in their business, or but for wage and price restrictions. Each of the experts opined that Caldwell's compensation in 1969 and 1970 was reasonable. However, a close scrutiny of the testimony reveals that the comparisons between Caldwell's compensation and that of other managers of car franchises were images without the substance of likeness. Much of petitioner's case was made on the basis of comparisons with and figures from 1972. These figures are irrelevant to 1969 and 1970 except to show that Superior was still viable in 1972 after having made payments *145 of compensation which consumed large percentages of gross receipts, net profits and taxable income. Although gross sales receipts increased and Superior's facilities had been doubled in 1968, sales declined and taxable income plummeted. The number of new cars sold by Superior, the standard widely used in the car-sales business by which to measure costs, profits and salaries, by 1970 still had not regained its 1968 level. Through 1970, Superior had never paid a dividend. After Caldwell the next highest paid officer throughout most of 1969 and all of 1970 was Charles W . King, the secretary-treasurer, who received an annual salary of $15,139.70 in 1969, and $20,112 in 1970. [2]
There is no evidence in the record that Caldwell assumed any new duties in 1969 or 1970. This Court cannot and should not be expected to ascertain with mathematical precision what a reasonable allowance for compensation is. We will use our *146 best judgment and discretion. (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. ; The expert opinions on salary and bonus levels expressed at trial do provide this Court with some broad brush guidelines as to reasonableness. Whether Caldwell's compensation is viewed as a whole amount in each year, or is broken into salary and bonus, the facts on the record before us lead this Court to the conclusion that the compensation paid to Caldwell was unreasonable to the extent it exceeded $89,000 for 1969, and $117,000 for 1970. Decision will be entered under Rule 155. Footnotes
*. Superior appropriated $89,460.13 to retained earnings in f.y. 1966; the decrease in retained earnings from 1965 to 1966 is due to the redemption of Glen L. Roberts' stock for $113,299. ↩
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified. ↩
2. The vice president of Superior, who left after the first three months of 1969, had been compensated at an annual rate of $47,600, but he was not replaced after his departure.The record does not indicate who, if anyone, assumed the vice president's duties. ↩